**No. 25-8083**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

BRIAN ALEXIS PATRON LOPEZ,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Southern District of California
No. 21-CR-1683-WQH
Hon. William Q. Hayes

---

# APPELLANT'S OPENING BRIEF

---

Meghan A. Blanco
LAW OFFICES OF MEGHAN BLANCO
28202 Cabot Road, Suite 300
Laguna Niguel, CA 92677
(949) 296-9869
mblanco@meghanblanco.com

*Attorney for or Appellant*
Brian Alexis Patron Lopez

# TABLE OF CONTENT

INTRODUCTION 1

JURISDICTIONAL STATEMENT 4

ISSUES PRESENTED 4

STATEMENT OF THE CASE 6

A. THE ORIGINAL IMPORTATION PLAN .................................................... 7
B. THE LATER EFFORT TO RECOVER THE DRUGS OR THEIR VALUE ........... 7
C. THE GOVERNMENT'S EVIDENCE CONCERNING THE KIDNAPPING AND KILLING 9
D. MATERIAL WITNESS A.V. ............................................................... 9
E. THE GOVERNMENT'S PROOF OF VENUE ............................................ 11
F. THE RULE 29 MOTION ..................................................................... 12
G. THE JURY INSTRUCTIONS ON COUNT ONE .......................................... 14
H. THE OUTSIDE COMMUNICATION WITH JUROR NO. 1 ........................... 15
I. VERDICT AND POST-TRIAL PROCEEDINGS .......................................... 17

SUMMARY OF THE ARGUMENT 18

ARGUMENT 21

I. THE DISTRICT COURT ERRED IN DENYING MR. PATRON'S RULE 29 MOTION AND IN USING A JUDICIALLY NOTICED INSTRUCTION TO CURE THE GOVERNMENT'S FAILURE TO PROVE VENUE UNDER 18 U.S.C. § 3238 ................................................................ 21
  A. Standard of Review ........................................................................ 21
  B. The Government Relied Upon 18 U.S.C. § 3238 To Establish Venue 21
  C. Proceedings Relating to Venue ......................................................... 23
  D. The Government Failed to Carry Its Burden of Proving Venue 26

II. DISTRICT COURT ABUSED ITS DISCRETION IN DENYING MR. PATRON'S MOTION FOR A NEW TRIAL AFTER A DELIBERATING JUROR RECEIVED AN UNSOLICITED OUTSIDE COMMUNICATION .... 32
  A. Standard Of Review ........................................................................ 32
  B. Juror 1 Receives A Text During Trial That She Fears May Be Related To The Case ........................................................................ 33
  C. Post-Verdict Procedural History ........................................................ 37

D. The District Court Erred In Concluding the Government Successfully Rebutted the Remmer Presumption of Prejudice ...................... 39
1. The outside communication created a credible risk of influencing the jury. ........................................................................ 40
2. The outside communication became part of the jury's deliberative environment. ..................................................................... 41
3. The district court replaced Remmer's objective inquiry with a subjective one. ....................................................................... 43
Although the district court conducted an evidentiary hearing, it ultimately denied relief because each juror testified that he or she believed the communication did not affect the verdict. In doing so, the court substituted a subjective inquiry for the objective analysis required by Remmer. ............... 43
4. Even accepting the district court's factual findings, the government failed to rebut Remmer's presumption. ..................................... 44
III. THE GOVERNMENT VIOLATED MR. PATRON'S DUE PROCESS AND COMPULSORY-PROCESS RIGHTS BY DEPORTING MATERIAL WITNESS A.V. AND THEN REFUSING TO PURSUE CONCRETE LEADS TO HIS WHEREABOUTS .......................................................................... 47
A. Standard of Review ................................................................ 47
B. A.V. Was a Material Eyewitness Whose Testimony Was Plausibly Favorable to the Defense ........................................................... 48
C. The Record Supports a Finding That the Government Acted in Bad Faith 50
D. The Government's Refusal to Pursue Concrete Leads to A.V.'s Whereabouts Compounded the Violation .................................................... 53
E. The District Court's Refusal to Order Discovery, Conduct an Evidentiary Hearing, or Provide Any Remedy Requires Reversal................. 55
IV. COUNT ONE MUST BE VACATED BECAUSE THE GENERAL VERDICT DOES NOT ESTABLISH THAT THE JURY UNANIMOUSLY FOUND THE SAME PREDICATE DRUG OFFENSE .................................... 56
A. Standard Of Review ................................................................ 57
B. The § 841 and § 960 Predicates Were Distinct Elements, Not Interchangeable Factual Means. ....................................................... 57
C. The Instructions and General Verdict Permitted a Nonunanimous Predicate Finding............................................................... 58
D. The Error Requires Reversal of Count One. ............................ 60
V. THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN COUNT ONE BECAUSE THE GOVERNMENT FAILED TO PROVE THAT MR. PATRON WAS ENGAGED IN A QUALIFYING FEDERAL DRUG OFFENSE AT THE TIME OF THE HOMICIDE ............................................................. 61

A. Standard of Review ........ 61
B. The Original Importation Conspiracy Had Ended Before Mr. Patron's Alleged Involvement ........ 61
C. Any Later Agreement Was A Separate Recovery Effort Without The Required United States Nexus ........ 62
D. No Rational Juror Could Find The Required Predicate Beyond A Reasonable Doubt ........ 64
CONCLUSION 66

# TABLE OF AUTHORITIES

## CASES

*Apprendi v. New Jersey*, 530 U.S. 466 (2000)------------------------------------------ 58
*Godoy v. Spearman*, 861 F.3d 956 (9th Cir. 2017), --------------------------------38, 39
*Hilliard v. Spalding*, 719 F.2d 1443 (9th Cir. 1983)------------------------------------ 50
*Remmer v. United States*, 347 U.S. 227 (1954) ------------------------------------passim
*Richardson v. United States*, 526 U.S. 813 (1999)--------------------------- 58, 59, 61
*United States v. Anderson*, 328 U.S. 699 (1946)--------------------------------------- 27
*United States v. Angulo*, 4 F.3d 843 (9th Cir. 1993)------------------------------------ 38
*United States v. Barai*, 55 F.4th 1245 (9th Cir. 2022)--------------------------------- 61
*United States v. Feng*, 277 F.3d 1151 (9th Cir. 2002)---------------------------------- 27
*United States v. Gastelum-Almeida*, 298 F.3d 1167 (9th Cir. 2002) ---------------- 50
*United States v. Henley*, 238 F.3d 1111, 1115-18 (9th Cir. 2001)------------------- 39
*United States v. Jaimez*, 45 F.4th 1118 (9th Cir. 2022) ------------------------------- 61
*United States v. Johnson*, 323 U.S. 273 (1944) ---------------------------------------- 27
*United States v. Liang*, 224 F.3d 1057 (9th Cir. 2000)--------------------------------- 27
*United States v. Montalvo*, 331 F.3d 1052 (9th Cir. 2003) -------------------------- 57
*United States v. Moran-Garcia*, 966 F.3d 966 (9th Cir. 2020)------------- 30, 31, 32
*United States v. Pace*, 314 F.3d 344 (9th Cir. 2002) ---------------------------------- 27
*United States v. Rodriguez-Moreno*, 526 U.S. 275 (1999) -------------------------- 27
*United States v. Sanchez*, No. 23-2533 (9th Cir. May 12, 2026)____________ 39
*United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982)-----------------------47, 48
*United States v. Voris*, 964 F.3d 864 (9th Cir. 2020)---------------------------------- 33

## STATUTES

18 U.S.C. § 3231 ---------------------------------------------------------------------4
18 U.S.C. § 3238 --------------------------------------------------------------passim
21 U.S.C. § 841 ---------------------------------------------------------------passim
21 U.S.C. § 848 ---------------------------------------------------------------passim
21 U.S.C. § 960 ---------------------------------------------------------------passim
28 U.S.C. § 1291 ---------------------------------------------------------------------4

## RULES

Federal Rule of Criminal Procedure 29 ---------------------------------------------passim
Federal Rule of Criminal Procedure 33 ------------------------------------------------ 37
Federal Rule of Evidence 201 ---------------------------------------------------------- 29

## CONSTITUTIONAL PROVISIONS

Sixth Amendment -------------------------------------------------------------------- 26

## INTRODUCTION

This appeal presents fundamental questions about the constitutional limits of the government's prosecution of crimes committed outside of the United States. For a homicide that occurred in Mexico, the government charged Brian Alexis Patron Lopez, an 18-year-old Mexican National with no ties to the United States, with intentional killing while engaged in drug trafficking in violation of 21 U.S.C. § 848(e)(1)(A), and hostage taking resulting in death in violation of 18 U.S.C. § 1203. The government predicted these charges upon a theory that the foreign land homicide occurred while Mr. Patron participated in a conspiracy to import methamphetamine into the United States.

Mr. Patron's trial was marked by a series of legal errors that independently—and collectively—require reversal. First, the government failed to meet its constitutional obligation to prove venue pursuant to 18 U.S.C. § 3238. Based thereon, the defense moved for judgment of acquittal pursuant to Rule 29. In response, the court, sua sponte, supplied the government's missing element. By way of a post-evidence judicially noticed instruction, informing the jury that the court "accept[ed] as proved" a geographic fact that the government did not prove and was at issue, the court relieved the government of its burden to prove venue and impermissibly resolved a factual issue.

Second, the court denied Mr. Patron's Rule 33 motion after a deliberating juror received unsolicited text messages that she believed might have been trial related. Rather than immediately reporting the communication, the juror independently investigated the sender, compared the results of that investigation with the trial evidence, discussed the matter with fellow jurors, and continued to deliberate while distracted by, and engulfed in, concern for her personal safety. Although these undisputed facts triggered the presumption of prejudice established by *Remmer v. United States*, 347 U.S. 227 (1954), the court denied relief based upon jurors' retrospective assurances that the communications did not affect deliberations.

Third, the government deported a material witness to the charged offenses, who had provided it with exculpatory information as to Mr. Patron, after determining that the witness would not advance its theory of the case. After the defense demonstrated the witness's materiality, the government failed to preserve his testimony and refused to undertake reasonable efforts to locate him. The court compounded the prejudice by denying discovery requested for the purpose of locating the witness. The court denied discovery despite the fact that an FBI agent, assigned to Mr. Patron's investigation, was in a romantic relationship with the witness's brother and could have supplied information regarding his location.

Fourth, Count One permitted conviction based on two distinct federal drug predicates: a conspiracy punishable under 21 U.S.C. § 841(b)(1)(A) and a conspiracy punishable under 21 U.S.C. § 960(b)(1). Although those offenses contain different elements, and rested on materially different evidence, the court declined to instruct the jury that it had to unanimously agree on the same predicate offense. Instead, the instructions permitted jurors to convict even if some concluded that Mr. Patron was engaged in the § 841 conspiracy, while others concluded the existence of the § 960 conspiracy. Because the predicate drug offense is an essential element of § 848(e)(1)(A), the Sixth Amendment required unanimous agreement on the same qualifying offense. The absence of a predicate-specific unanimity instruction, therefore, requires reversal of Count One.

Finally, the government failed to present sufficient evidence that Mr. Patron was engaged in a qualifying federal drug offense at the time of the homicide as required by § 848(e)(1)(A). The government's own witnesses established that the original conspiracy to import methamphetamine into the United States had ended *before* Mr. Patron allegedly became involved. At most, the evidence established Mr. Patron's participation in a subsequent effort to recover the stolen drugs, proceeds, or their equivalent value in Mexico—a materially different undertaking that lacked the federal narcotics nexus required by § 848(e)(1)(A).

Because each of these errors independently require reversal—and because, viewed together, they deprived Mr. Patron of the fair trial guaranteed by the Fifth and Sixth Amendments—the judgment should be reversed and the case remanded for a new trial.

## JURISDICTIONAL STATEMENT

Appellant Brian Alexis Patron Lopez appeals his conviction for violations of 21 U.S.C. § 848(e)(1)(A) (intentional killing while engaged in drug trafficking) and 18 U.S.C. § 1203 (hostage taking resulting in death). The district court asserted jurisdiction, contested below, under 18 U.S.C. § 3231 and entered judgment on December 11, 2026. 1-ER-2. Mr. Patron filed a timely notice of appeal. 8-ER-2044. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

Mr. Patron is currently serving a life sentence.

## ISSUES PRESENTED

1. Whether the government failed to establish venue pursuant to 18 U.S.C. § 3238 and whether the district court erred by denying Mr. Patron's Rule 29 motion and instructing the jury that it "accept[ed] as proved" a venue-fixing fact for which the government had presented no evidence.
2. Whether the district court abused its discretion in denying Mr. Patron's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 after a deliberating juror received an unsolicited outside communication,

conducted independent research, shared the communication with other jurors, and continued deliberating without notifying the court, notwithstanding the presumption of prejudice recognized in *Remmer v. United States*, 347 U.S. 227 (1954).

3. Whether the government violated Mr. Patron's rights under the Fifth and Sixth Amendments by deporting a material witness before trial, failing to preserve his testimony or make reasonable efforts to locate him after his materiality became apparent, and whether the district court further erred by denying discovery and an evidentiary hearing concerning information that could have led to the witness's whereabouts.

4. Whether the district court violated the Sixth Amendment's unanimity requirement by instructing the jury that it could convict Mr. Patron of violating 21 U.S.C. § 848(e)(1)(A) without unanimously agreeing whether he was engaged in a conspiracy punishable under 21 U.S.C. § 841(b)(1)(A) or a conspiracy punishable under 21 U.S.C. § 960(b)(1), where those alternative predicate offenses contain different elements and rested on materially different evidence.

5. Whether the evidence was sufficient to prove that, at the time of the homicide, Mr. Patron was engaging in a felony punishable under 21 U.S.C. § 841(b)(1)(A) or § 960(b)(1), as required by 21 U.S.C. § 848(e)(1)(A), where

the government's own evidence established that the original importation conspiracy had already ended before Mr. Patron allegedly became involved and that any later agreement concerned only the recovery of stolen drugs or money in Mexico.

## STATEMENT OF THE CASE

This case arises from the March 2020 kidnapping and killing of Miguel Anthony Rendon in Tijuana, Mexico. 8-ER-2040. The government alleged that Rendon agreed to carry approximately two pounds of methamphetamine across the international border into the United States but absconded with the drugs before completing the planned crossing. 2-ER-443, 458. According to the government, Mr. Patron subsequently participated in Rendon's kidnapping and killing in an effort to recover the stolen methamphetamine or its value 2-ER-453, 484.

A second superseding indictment charged Mr. Patron with intentional killing while engaged in drug trafficking, in violation of 21 U.S.C. § 848(e)(1)(A), together with hostage taking resulting in death and related offenses. 8-ER-2040. As to Count One, the indictment alleged that the killing occurred while Mr. Patron was engaged in either a conspiracy to possess methamphetamine with intent to distribute, punishable under 21 U.S.C. § 841(b)(1)(A), or a conspiracy to import methamphetamine, punishable under 21 U.S.C. § 960(b)(1). *Id*. Mr. Patron pleaded not guilty and proceeded to trial.

### A. The Original Importation Plan

The government's proof concerning the narcotics transaction came principally from cooperating witnesses, including Alan Lomeli. Lomeli testified that the narcotics transaction agreement involved Rendon, Wyatt Valencia-Pacheco, an individual known as Parce, and Lomeli himself. 3-ER-801. Under the plan, Rendon was to transport approximately two pounds of methamphetamine into the United States, where the drugs would be delivered and the participants would be paid. *Id.*

The evidence indicated that Mr. Patron was uninvolved in the formation or execution of the plan. 3-ER-801-806; 5-ER-1294. Not a scintilla of evidence was introduced that Mr. Patron recruited Rendon, obtained the drugs, prepared Rendon for the crossing, accompanied the group to the border, participated in the attempted crossing, or expected payment from the planned crossing. *Id*.

According to Lomeli, the plan failed when Rendon absconded with the methamphetamine rather than carrying it across the border. 3-ER-805. Lomeli further testified that, because Rendon absconded, and the importation objective was not completed, Rendon, Lomeli, and Wyatt became financially responsible to Parce for the missing contraband. 3-ER-805-08.

### B. The Later Effort to Recover the Drugs or Their Value

The government's witnesses averred that Mr. Patron's involvement commenced *after* Rendon absconded with the contraband. *Id*. That notwithstanding, the government contended that the subsequent effort to locate Rendon and recover the contraband so that Parce could be repaid, in which Mr. Patron allegedly participated, was part of the same narcotics conspiracy. 2-ER-450-51, 484. The defense maintained that the effort to recover the drugs was a materially different undertaking. 2-ER-490.

The evidence did not establish that the participants planned to transport the drugs, that they sought to recover from Rendon, to the United States. *Id.*; 5-ER-1265, 1267, 1292. And the evidence did not establish that the participants planned to distribute funds--if money had been recovered from Rendon in lieu of drugs--to the United States. *Id.* Thus, the defense distinguished the original importation agreement from the later recovery effort: the former contemplated bringing methamphetamine into the United States; the latter concerned recouping a loss in Mexico after the contemplated importation plan had failed. 2-ER-490.

That distinction became central to Count One. The government relied on the planned border crossing to support the § 960 importation predicate and on the later recovery effort to connect Mr. Patron to drug trafficking. 2-ER-478. The defense argued that Mr. Patron never joined the original importation conspiracy and that

any later agreement lacked the United States distribution objective necessary for the alternative § 841 predicate. 2-ER-490.

### C. The Government's Evidence Concerning the Kidnapping and Killing

The government's account of the kidnapping and killing relied upon witnesses who admitted participating in the events and testified pursuant to cooperation agreements or with the expectation of favorable treatment. 5-ER-1241. Those witnesses described their efforts to find Rendon, detain him, move him among locations in Tijuana, and ultimately kill him. 5-ER-1195, 1254. The government alleged that Mr. Patron participated in those events. Mr. Patron disputed both his role in the homicide and the government's claim that any conduct attributed to him occurred while he was engaged in either of the charged federal drug conspiracies.

FBI Special Agent Paisley testified concerning portions of the investigation, including interviews of witnesses and arrests of participants. 3-ER-570, 654. The government also used maps and other exhibits to detail the events that occurred in Tijuana. 3-ER-754.

### D. Material Witness A.V.

A.V. is Wyatt Valencia's brother. 5-ER-1186. He was one of the few witnesses who possessed firsthand knowledge of the events that preceding

Rendon's killing. According to the government's investigation, A.V. transported Rendon, remained with him during portions of his captivity, assisted in moving him among locations in Tijuana, and admitted to holding him overnight at a hotel. 3-ER-596, 768, 771-77, 807. Federal authorities detained A.V. as a material witness and interviewed him while considering whether to charge him. 3-ER-571, 596.

At the time of those interviews, investigators had already developed the theory that Mr. Patron shot Rendon. 4-ER-891-93; 5-ER-1210, 1215. Agent Paisley implied that investigators hoped A.V. would provide information that "help[ed]" advance the FBI's investigation. 3-ER-593. Instead, according to Paisley, A.V. denied or minimized his own involvement, did not provide information that investigators considered useful, and "didn't help [the FBI]." 3-ER-593. Investigators eventually concluded that they had no additional information to obtain from A.V. *Id.*

Although the government had considered prosecuting A.V., it ultimately released him from federal custody and deported him to Mexico before Mr. Patron was indicted. 3-ER-592. The release paperwork identified A.V.'s brother, Wyatt, as the family member involved in securing his release. 8-ER-2053.

During pretrial proceedings, the defense learned that a different FBI agent connected to the investigation—not Agent Paisley—was engaged in a romantic

relationship with another one of A.V.'s brothers, Joey, who worked as an agent for the US Border Patrol. 1-ER-92; 12-ER-1252. The defense sought discovery and requested an evidentiary hearing to help determine A.V.'s location. 1-ER-92. The defense also asked the court to require the government to determine whether A.V.'s brother, who was in a romantic relationship with an FBI agent on the prosecution team, possessed information that could assist in locating. *Id*.

The court denied the requested hearing and discovery and declined to require the government to make further inquiry into A.V.'s location. 1-ER-92, 216. It also restricted the defense from presenting evidence concerning the FBI agent's romantic relationship with Wyatt without prior leave of court. *Id*. Mr. Patron, therefore, was forced to proceed at trial without access to A.V. or his testimony. *Id.*

### E. The Government's Proof of Venue

Because the charged conduct occurred principally in Mexico, the government relied on 18 U.S.C. § 3238 to establish venue in the Southern District of California. The government's theory was that venue attached through the arrest of cooperating witness Alan Lomeli, whom it treated as the first joint offender arrested in connection with the case. 2-ER-482.

On direct examination, the prosecutor asked Lomeli whether he had been arrested on June 7, 2021 "at the San Ysidro Port of Entry." Lomeli answered in the affirmative. 4-ER-835. The prosecutor then moved on to another subject *without*

eliciting on which side of the international boundary line Lomeli was arrested, or to which judicial district he was first taken following his arrest. *Id.*

The government did, however, present testimony from Agent Paisley about the San Ysidro Border. 4-ER-945. While displaying an aerial map that depicted Tijuana and San Diego, the prosecutor asked Paisley to identify the international boundary line and the San Ysidro Port of Entry. *Id.* Paisley marked, for the jury, the San Ysidro Port of Entry with an "S". Her marking placed the Port of Entry entirely on the Mexican side of the international boundary line. 4-ER-945; 3-ER-754. Paisley later testified that Lomeli "was arrested when *crossing* at the San Ysidro Port of Entry". 3-ER-944. The government did not, however, ask her on which side of the international boundary line the arrest occurred. Nor did it ask her whether Lomeli had formally entered the United States prior to his arrest. And it did not ask her whether the arrest occurred within the Southern District of California. *Id.*

### F. The Rule 29 Motion

After the government rested, Mr. Patron moved for judgment of acquittal under Federal Rule of Criminal Procedure 29. He challenged both venue and the sufficiency of the evidence. 1-ER-73; 3-ER-703.

As to Count One, defense counsel argued that the government had failed to prove that Mr. Patron was engaged in either charged federal drug conspiracy at the

time of the homicide. *Id.* The original importation conspiracy, counsel explained, had been formed and completed by Rendon, Wyatt, Parce, and Lomeli *before* Mr. Patron allegedly became involved. Every material step of the planned importation occurred without Mr. Patron—no evidence existed of his participation until *after* the importation scheme had concluded. *Id.*

Defense counsel argued that Mr. Patron's participation in a subsequent agreement--to recover the methamphetamine or its monetary value--was *not* the conspiracy charged in the indictment. 3-ER-704. The objective of the recovery effort was to recover the value of the absconded contraband in Mexico so that Parce could be repaid. The government introduced no evidence that Mr. Patron agreed to the original importation plan, that anyone intended to transport the drugs that they sought to recover into the United States, or that the drug recovery effort contemplated distribution within the United States. Thus, assuming arguendo that Mr. Patron participated in the drug recovery effort, at most that constituted a separate agreement to recover money or property in Mexico—not a conspiracy punishable under §§ 841 or 960. *Id.*

As to venue, counsel argued that the government had failed to prove the location of the venue-fixing arrest under § 3238. 2-ER-394; 3-ER-703. The government responded that Lomeli had been arrested at the San Ysidro Port of

Entry, and it asserted that the arrest occurred in the Southern District, but it did not identify any evidence to establish that proposition. *Id*.

The court denied the Rule 29 motion. 2-ER-394. Subsequent thereto, it proposed an instruction accepting as true the fact that the San Ysidro Port of Entry is in the Southern District of California. 2-ER-405. Defense counsel objected and averred that the government had failed to prove the venue-fixing fact during its case-in-chief. Defense counsel argued, inter alia, that venue was a factual question for the jury—particularly because the San Ysidro Port of Entry encompasses both sides of the international boundary line. 2-ER-394-405. That notwithstanding, the court instructed the jury that it "accept[ed] as proved" that the San Ysidro Port of Entry is located within the Southern District of California, "even though no evidence was presented on this point." 1-ER-67. The court further instructed the jury that venue need be proved only by a preponderance of the evidence.

### G. The Jury Instructions on Count One

For Count One, the court instructed the jury that it could convict if the government proved that Mr. Patron acted while engaged in either a conspiracy to possess methamphetamine with intent to distribute, punishable under § 841(b)(1)(A), or a conspiracy to import methamphetamine, punishable under § 960(b)(1). 1-ER-68. The instructions separately described the two predicates and their different objects. *Id.*

The defense requested language requiring the jury unanimously to find the predicate drug violation and proposed separate instructions addressing possession with intent to distribute and import. 1-ER-84, 89. The district court rejected that approach. 1-ER-68.

### H. The Outside Communication with Juror No. 1

Trial began on March 10, 2025. 1-ER-219. Closing arguments concluded on March 18, 2025, and the jury commenced deliberations immediately thereafter. That evening, Juror No. 1 received unsolicited text messages from an unknown Colorado telephone number. 2-ER-303. The sender identified herself as "Vanessa Zhang" and claimed to have met Juror No. 1 at a charity event. Juror No. 1 responded by informing the sender that she had the wrong number. Juror No. 1 later blocked and deleted the messages. *Id.*

Juror No. 1 did not disregard the communication. 2-ER-315. After reviewing her trial notes, she noticed a name that she associated with the messages. 2-ER-303. Based thereon, she recovered the deleted messages, searched the number on the internet, and compared the results of her internet research with her notes from trial. *Id*. She then showed the messages to other jurors and asked whether they believed that the communication was "something to be concerned about." 2-ER-304.

Juror No. 1 did not immediately report the incident to the court. 2-ER-370. Instead, she continued to deliberate. And, as she would later testify, she did so despite the fact that: i) the communication caused her mind to go to "negative places"; ii) she remained wary and protective of her safety; and iii) she did not want to take a chance. *Id.* Immediately after the verdict, she approached the bailiff because she wanted reassurance from someone who "works in the system" and because, without that reassurance, the incident would remain on her mind. 2-ER-303-07.

The jurors gave materially different accounts of when the messages became known and how broadly they were discussed during deliberations. *See e.g*. 2-ER-314; 318. Some testified that they learned of the incident only after the verdict. 2-ER-314. But others recalled discussion of the meaning and import of the messages before the verdict. 2-ER-318. And two jurors recalled that a conversation occurred, involving multiple jurors, in which statements of concern or caution were expressed. 2-ER-327, 336. One juror recalled that the similarities between the sender's name, the Colorado telephone number, and evidence at trial, "caused some alarm." 2-ER-218. Another juror recalled that Juror No. 1 continued to be "freaked out" about the text even after the verdict had been rendered. 2-ER-335.

### I. Verdict and Post-Trial Proceedings

On March 19, 2025, the jury returned guilty verdicts. 1-ER-221. Because the jury was not instructed on unanimity, its verdict did not reveal whether the jurors unanimously agreed on the § 841 predicate, unanimously agreed on the § 960 predicate, or were divided between the two alternatives. 1-ER-68.

Mr. Patron moved for a new trial under Federal Rule of Criminal Procedure 33 based on the outside communication with Juror No. 1 and the distraction it generated. He argued that the communication triggered the presumption of prejudice recognized in *Remmer v. United States* 347 U.S. 227 (1954). 2-ER-235.

The court conducted evidentiary hearings on May 16, May 19, and May 21, 2025, and questioned the deliberating jurors individually. 2-ER-280-352. The testimony confirmed that Juror No. 1 had received the communication, conducted independent research, compared the outside information with the trial evidence, discussed the incident with other jurors, and delayed reporting it until after the verdict. *Id.* The district court nevertheless denied the Rule 33 motion, relying principally on its assessment that the messages were likely spam and on the jurors' assurances that it did not affect their verdicts. 1-ER-8.

Judgment was entered, and Mr. Patron timely appealed. 8-ER-2044.

## SUMMARY OF THE ARGUMENT

Mr. Patron's convictions should be reversed because the proceedings were infected by multiple constitutional and legal errors that individually—and certainly cumulatively—deprived him of a fair trial.

First, the government failed to establish venue under 18 U.S.C. § 3238. The government presented no evidence establishing the critical fact necessary to prove that the first joint offender was arrested within the Southern District of California. After the defense raised that failure in a Rule 29 motion, the court effectively supplied the missing proof by instructing the jury that it "accept[ed] as proved" that the San Ysidro Port of Entry is located within the Southern District of California, even though "no evidence was presented on this point." In so doing, the court resolved a factual issue reserved for the jury and relieved the government of its burden to prove venue through evidence admitted at trial.

Second, the court abused its discretion by denying Mr. Patron's motion for a new trial after a deliberating juror received an unsolicited outside communication. Rather than immediately notifying the court, the juror investigated the communication, compared the results of her investigation with the trial evidence, discussed the incident with other jurors, and continued deliberating despite being concerned for her safety. These undisputed facts triggered the presumption of prejudice recognized in *Remmer*. The court, nevertheless, denied relief by relying

primarily on speculation that the messages were spam and on jurors' retrospective assurances that the communication did not affect their deliberations. That approach is inconsistent with *Remmer* and its progeny and fails to rebut the presumption of prejudice.

Third, the government deprived Mr. Patron of a fundamentally fair trial by deporting a material witness, after concluding that he would not advance the government's theory of the case, without preserving his testimony or making reasonable efforts to secure his availability for trial. After the defense demonstrated the witness’s materiality, the district court compounded the prejudice by denying discovery and an evidentiary hearing that were requested in an effort to locate the witness. The court did so despite the fact that an FBI agent, involved in the case, was actively engaged in a romantic relationship with the witness’s brother. The court’s rulings prevented Mr. Patron from obtaining testimony from one of the few surviving eyewitnesses to the charged offenses and, thereby, violated his constitutional right to due process and compulsory process.

Fourth, Count One cannot stand because the district court failed to instruct the jury on unanimity as to an essential element of the offense. Section 848(e)(1)(A) criminalizes an intentional killing committed while engaging in a qualifying federal drug felony. Here, the indictment alleged two distinct predicate offenses: a conspiracy punishable under 21 U.S.C. § 841(b)(1)(A) and a conspiracy

punishable under 21 U.S.C. § 960(b)(1). Those predicates contain different elements, criminalize different conduct, and rested on materially different evidence. Yet the court instructed the jury that it could convict without agreeing on which predicate offense that Mr. Patron committed. Some jurors, therefore, could have concluded that Mr. Patron engaged in the § 841 conspiracy, while others could have found that he engaged in the § 960 conspiracy. Because the predicate drug offense is an essential element of § 848(e)(1)(A), the Sixth Amendment requires that jurors unanimous agreement on the qualifying offense.

Lastly, the government failed to present sufficient evidence that Mr. Patron was engaged in either charged predicate conspiracy at the time of the homicide. The government's own witnesses established that the original conspiracy to import methamphetamine into the United States was formed, undertaken, and had already failed, before Mr. Patron allegedly became involved. According to that testimony, any subsequent agreement solely pertained to the attempted recovery, in Mexico, of the stolen drugs, proceeds, or equivalent value. The government presented no evidence that this later undertaking contemplated importing methamphetamine into the United States or distributing it once there. At most, the evidence established participation in a different agreement that occurred entirely in Mexico. Because no rational juror could conclude beyond a reasonable doubt that Mr. Patron was

engaged in a felony punishable under §§ 841 or 960 at the time of the homicide, the court erred in denying his Rule 29 motion.

Each of these errors independently require reversal. Collectively, they demonstrate that Mr. Patron did not receive a fair trial as guaranteed by the Fifth and Sixth Amendments. The Court should reverse the judgment and remand for a new trial.

## ARGUMENT

### I. THE DISTRICT COURT ERRED IN DENYING MR. PATRON'S RULE 29 MOTION AND IN USING A JUDICIALLY NOTICED INSTRUCTION TO CURE THE GOVERNMENT'S FAILURE TO PROVE VENUE UNDER 18 U.S.C. § 3238

#### A. Standard of Review

A district court's decision on a Rule 29 motion for judgment of acquittal is also reviewed de novo, with all evidence viewed in the light most favorable to the government. *United States v. Bahena-Cardenas*, 70 F.3d 1071 (9th Cir. 1995). A district court's decision to take judicial notice of an adjudicative fact under FRE 201 is reviewed de novo. *United States v. Garrido,* 596 F.3d 613 (9th Cir. 2010).

#### B. The Government Relied Upon 18 U.S.C. § 3238 To Establish Venue

The government relied upon 18 U.S.C. § 3238 to establish venue based on the arrest of cooperating witness Alan Lomeli. The government's proof on that

issue, however, was brief and insufficient. During its direct examination of Mr. Lomeli, the prosecutor asked:

Q. "Were you arrested about a year after the murder on June 7, 2021, at the San Ysidro Port of Entry?"

A. "Yes." 4-ER-835.

The prosecutor then immediately turned to Mr. Lomeli's post-arrest interview:

Q. "Did the agents interview you at that time?"

A. "Yes." *Id*.

The government elicited no further testimony from Mr. Lomeli regarding the location of his arrest or the judicial district to which he was first transported following his arrest.

The government also presented testimony from FBI Special Agent Paisley. During her testimony, the prosecutor displayed an aerial map of Tijuana depicting locations relevant to the investigation. 4-ER-945. The prosecutor asked Agent Paisley to identify the international border and the San Ysidro Port of Entry. Agent Paisley marked the international boundary on the exhibit and circled the San Ysidro Port of Entry, where the victim, Rendon, stole the drugs on the Mexican side of the port. She also identified two hotels located in Mexico. *Id.*

Agent Paisley did, however, testify about the locations of other arrests with specificity. She testified that Wyatt Valencia was arrested only after he had successfully *crossed* into the United States and arrived in El Paso, Texas. 3-ER-571. And she testified that Jonathan Montaño was arrested in Colorado. 3-ER-654. Those specific geographical details were presented to the jury and figured prominently during deliberations. But the government elicited no comparable testimony to establish that Mr. Lomeli's arrest occurred at a location wholly within the Southern District of California. As a result, the government failed to present evidence establishing the critical venue fact required under 18 U.S.C. § 3238.

### C. Proceedings Relating to Venue

After the government rested its case-in-chief, Mr. Patron moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. 3-ER-703. Defense counsel argued that the government had failed to establish venue because venue is a factual issue that must be proved by a preponderance of the evidence. *Id*. Further, counsel argued that, because the charged conduct occurred outside of the United States, and Mr. Patron had been extradited from Mexico, the government was required to establish venue under 18 U.S.C. § 3238 but had failed to present evidence establishing that the first arrest occurred within the Southern District of California. The court took the motion under submission and permitted supplemental briefing.

In opposition to the motion, the government argued that venue was proper because Mr. Lomeli was "the first person arrested" in the investigation and had been arrested "here in the Southern District of California at the San Ysidro Port of Entry." 3-ER-705. Relying on § 3238, the government maintained that venue was fixed by Mr. Lomeli's arrest. It did not, however, identify any testimony or evidence that established that the arrest occurred within the Southern District of California. Instead, it solely relied on testimony that Mr. Lomeli had been arrested at the "San Ysidro Port of Entry." *Id.*

That evening, Mr. Patron filed supplemental authority and argued that the government had failed to present sufficient evidence to establish venue before it rested. 2-ER-393. And he averred that judicial notice could not be used to cure the government's evidentiary failure. His filing explained that the San Ysidro Port of Entry spans both sides of the United States-Mexico boundary line and that the testimony, that Mr. Lomeli was arrested "at the San Ysidro Port of Entry", did not establish that the arrest formally occurred within the Southern District of California—or even within the United States. *Id* at 397. In fact, the government never identified the precise location of the arrest, established the side of the international boundary line on which it occurred, or introduced evidence that reflected that it occurred within the Southern District of California.

Indeed, the only evidence admitted at trial, regarding the location of the San Ysidro Port of Entry vis à vis the international boundary line, was Government Exhibit 360B.[1] On that exhibit—an aerial map—Agent Paisley identified the Port of Entry by placing an "S" *entirely* on the Mexican side of the international boundary line. 3-ER-754. Thus, rather than supporting venue, the government's exhibits reflect that the arrest occurred in Mexico. Despite that, the court denied Mr. Patron's Rule 29 motion, reasoning that the deficiency in the government's proof could be cured by the court sua sponte taking judicial notice of the disputed fact. The defense objected. 1-ER-76.

Thereafter, rather than orally judicially noticing the disputed fact, the court proposed a jury instruction that stated that "the San Ysidro Port of Entry is in the Southern District of California." 2-ER-405. Defense counsel objected. *Id*. Counsel argued that venue remained a factual issue for the jury to determine and that the court could not permissibly cure the government's evidentiary failure by instructing the jury to accept as true a fact that had not been proved by the government. Counsel further noted that the government's evidence did not establish the precise location of Mr. Lomeli's arrest and that the San Ysidro Port of Entry spanned both sides of the international boundary line.

[1] Exhibit 360A was identical to Exhibit 360B, except that Special Agent Paisley was asked to mark the location of the San Ysidro Port of Entry on Exhibit 360B by writing an "S" on the map.

When instructing the jury, the court informed it that it "accept[ed] as proved" that the San Ysidro Port of Entry is located within the Southern District of California, "even though no evidence was presented on this point." 1-ER-67. The court also instructed the jury that venue need only be proved by a preponderance of the evidence.

### D. The Government Failed to Carry Its Burden of Proving Venue

Venue is not a procedural technicality. It is a constitutional safeguard. Article III requires that criminal trials be held in the State where the crime was committed, U.S. Const. art. III, § 2, cl. 3, and the Sixth Amendment guarantees trial before a jury "of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. These provisions protect defendants from prosecution in an improper forum and preserve the right to trial before a jury drawn from the community where the offense occurred. *United States v. Cores*, 356 U.S. 405, 407 (1958).

Accordingly, "[q]uestions of venue in criminal cases . . . are not merely matters of formal legal procedure," but implicate "the fair administration of criminal justice and public confidence in it." *United States v. Johnson*, 323 U.S. 273, 276 (1944). When venue is contested, the government bears the burden of proving it by a preponderance of the evidence. *United States v. Pace*, 314 F.3d 344, 349 (9th Cir. 2002).

The government failed to satisfy that burden here.

Section 3238 fixes venue by a specific historical event: where a joint offender is first arrested or first brought into the United States. Courts have consistently recognized that this is an objective historical fact that determines venue once it occurs. *See United States v. Liang*, 224 F.3d 1057, 1060-61 (9th Cir. 2000); *United States v. Feng*, 277 F.3d 1151, 1155 (9th Cir. 2002). Because Congress selected that event to determine venue, the government was required to prove through evidence admitted at trial where it occurred.

It did not.

The government's proof established only that Mr. Lomeli was arrested "at the San Ysidro Port of Entry." Although the government introduced an aerial map of the Port of Entry, the map depicts the San Ysidro Port of Entry as being located entirely within Mexico. The government likewise failed to establish where, within the Port of Entry, Mr. Lomeli was arrested. And it failed to establish whether Mr. Lomeli had formally crossed into the United States before his arrest, or whether his arrest occurred within the Southern District of California. Because § 3238 makes the location where the first joint offender is arrested, or first brought, the fact that fixes venue, the government's proof failed to establish the essential venue predicate.

That government's evidentiary deficiency required acquittal under Rule 29. At the close of the government's case, the evidentiary record contained no proof that Mr. Lomeli was arrested within the Southern District of California. Viewing the evidence admitted before the government rested, no rational jury could have found, by a preponderance of the evidence, that venue had been established under § 3238.

Rather than grant the Rule 29 motion, the district court instructed the jury:

"The Court accepts as proved the fact that the San Ysidro Port of Entry is in the Southern District of California, even though no evidence was presented on this point . . . ." 1-ER-67.

That instruction supplied the precise factual link that was missing from the government's case. The government will likely characterize the court's judicially noticed instruction as an indisputable geographic fact. But that would misstate the issue. The disputed question was not whether some portion of the San Ysidro Port of Entry lies within the Southern District of California. The disputed question was whether the place where Mr. Lomeli was arrested—the historical event that fixes venue under § 3238—occurred within the Southern District.

Mr. Patron squarely raised that issue in his supplemental Rule 29 filing. As he explained, the San Ysidro Port of Entry straddles the international boundary line and the government never established where, within the Port of Entry, Mr. Lomeli

was arrested. The Supreme Court's recent decision in *Mullin v. Al Otro Lado*, 609 U.S. ___ (2026), underscores why that omission matters. In distinguishing between individuals on the Mexican side of a port of entry, and those who had crossed into the United States, the Court held that a person does not "arrive[] in the United States" until they have crossed the international boundary line. *Mullin* thus confirms that merely identifying the "San Ysidro Port of Entry" does not establish a location within the United States, much less within the Southern District of California. The government's proof, therefore, failed to establish the dispositive venue fact: on which side of the international boundary line the venue-triggering arrest actually occurred.

That unresolved factual dispute foreclosed an instruction that the "Court accepts as proved" that the San Ysidro Port of Entry is located within the Southern District of California. Federal Rule of Evidence 201 permits judicial notice only of facts that are "not subject to reasonable dispute." It does not authorize a court to resolve a disputed factual predicate, which is essential to the government's proof, by way of judicial notice. Nor does it permit the court, after the government has rested and the defense has exposed its evidentiary omission in a Rule 29 motion, to cure its omission via a judicially noticed instruction.

The court's use of a jury instruction, to cure the government's omission, cannot be reconciled with this Court's holding in *United States v. Moran-Garcia*,

966 F.3d 966 (9th Cir. 2020). In *Moran-Garcia*, the government proved only that the defendant's vessel was apprehended approximately six miles off the coast of San Diego. The district court denied the defendant's Rule 29 motion, concluded that venue existed as a matter of law, and refused to submit venue to the jury because it believed venue was a legal question the court had already resolved. *Id*. at 968-69.

The Ninth Circuit reversed. It held that venue "is a question of fact that the government must prove by a preponderance of the evidence," that "normally it is not for the court to determine venue," and that the district court therefore "could not properly decide venue itself and should have submitted the issue to the jury." *Id*. at 969-70. This Court held that the district court erred by, inter alia, resolving the disputed factual issue of venue.

Critically, *Moran-Garcia* turned on the precise location of the venue-triggering event. Although the defendant was apprehended in waters off San Diego, where venue could extend, the Southern District did not formally extend to the place in which he was apprehended. Congress defined the Southern District by county boundaries, and California law extended San Diego County only three miles into the Pacific Ocean. Because the defendant was arrested six miles offshore, the government's generalized proof, that the defendant was apprehended "off San Diego", did not establish that he was formally apprehended within the

Southern District. The legally dispositive question was not the general vicinity of the arrest, but its precise location.

The same principle controls here. Section 3238 fixes venue by the place where a joint offender is first arrested or first brought into the United States. The government proved only that Mr. Lomeli was arrested "at the San Ysidro Port of Entry." That generalized description no more establishes venue than "off the coast of San Diego" established venue in *Moran-Garcia*. Like the Pacific Ocean in *Moran-Garcia*, the San Ysidro Port of Entry encompasses locations with different legal significance. Portions of the Port of Entry lie within the Southern District of California, while other portions lie on the Mexican side of the international boundary line. The dispositive question, therefore, is not whether the Port of Entry is generally associated with San Diego, but whether the specific location in which the arrest occurred is within the Southern District. The government never answered that question. It introduced no testimony identifying the precise location of the arrest, whether Mr. Lomeli had crossed the international boundary line before being arrested, or whether the arrest occurred within the Southern District.

Rather than require the government to prove that fact, the court supplied the missing factual predicate itself. It instructed the jury that it "accept[ed] as proved" that the San Ysidro Port of Entry is in the Southern District of California, "even though no evidence was presented on this point." 1-ER-67. That instruction did

more than identify a generally undisputed geographic fact. It permitted the jury to equate "arrested at the San Ysidro Port of Entry" with "arrested within the Southern District of California". And, in so doing, the court supplied the jury with the factual predicate that the government had failed to prove.

Although the court later instructed the jury that it was not required to accept the judicially noticed fact, the constitutional error identified in *Moran-Garcia* had already occurred. The court had informed the jury that it had accepted the critical factual premise as proved. 1-ER-67. Coming only after the Rule 29 motion exposed the government's failure of proof, the instruction necessarily conveyed the court's resolution of the disputed venue question. In practical effect, the court determined the historical fact on which venue depended and deprived the jury of its constitutional role in deciding that issue.

Because the government failed to prove where the venue-fixing event occurred before resting its case, the court erred in supplying the missing factual predicate through judicial notice and in denying Mr. Patron's Rule 29 motion.

## II. DISTRICT COURT ABUSED ITS DISCRETION IN DENYING MR. PATRON'S MOTION FOR A NEW TRIAL AFTER A DELIBERATING JUROR RECEIVED AN UNSOLICITED OUTSIDE COMMUNICATION

### A. Standard Of Review

A district court's denial of a motion for a new trial is reviewed for abuse of discretion. *United States v. Voris*, 964 F.3d 864, 869 (9th Cir. 2020).

### B. Juror 1 Receives A Text During Trial That She Fears May Be Related To The Case

The government's case rested largely on the testimony of cooperating witnesses who had participated in the kidnapping and murder of Mr. Rendon. The evidence portrayed a violent drug-trafficking organization and included testimony concerning retaliation, murder, witness cooperation, and criminal activity occurring in both Mexico and the United States. The government also introduced evidence that one of its cooperating witnesses had previously operated a drug-trafficking organization in Colorado before entering into a cooperation agreement with the government. 2-ER-306; 4-ER-1081, 1087. The jury further learned that, even after beginning his cooperation, the witness continued to oversee drug-trafficking organizations while incarcerated in California. 4-ER-1089.

Trial commenced on March 10, 2025. Closing arguments concluded on March 18, 2025, and the jury commenced deliberations immediately thereafter.

That evening, Juror No. 1 received a series of unsolicited text messages from an unknown Colorado telephone number. The sender identified herself as "Vanessa Zhang" and claimed that she and Juror No. 1 had previously met at a charity gala. Juror No. 1 responded that the sender had the wrong number before ultimately blocking and deleting the messages. 2-ER-303.

Although Juror No. 1 initially believed the messages were likely unsolicited spam, she later reviewed her trial notes and noticed the name "Vanness," which she associated with testimony concerning a cooperating witness who had previously operated a Colorado drug-trafficking organization. She then searched the sender's telephone number on the internet, confirmed that it originated in Colorado, and began to question whether the messages might be related to the trial. Concerned by that possibility, she recovered the deleted messages from her phone and showed them to her fellow jurors because she wanted "a second opinion" about whether the communication was "something to be concerned about." 2-ER-304.

Juror No. 1 ultimately concluded that the communication was "most likely spam and nothing that's actually connected with what's being discussed here." 2-ER-307. Nevertheless, prior thereto, she remained sufficiently concerned. In fact, after the verdict, she sought out the court's bailiff because she wanted the opinion of someone who "works in the system" regarding whether the messages were "actually something to worry about." *Id*. She testified that, had she not done so, the issue "would keep being in my mind," and acknowledged that she remained "protective of [her] own safety" and "didn't want to take a chance."

The remaining jurors gave materially different accounts regarding both the timing and extent of the discussions concerning the text messages.

Juror No. 2 testified that he first learned about the messages only after the jury had returned its verdict. 2-ER-314. He recalled Juror No. 1 mentioning that she had received a strange text message but immediately assumed that it was merely a phishing or spam message. He specifically testified that he heard nothing whatsoever about the communication during deliberations.

Juror No. 3 gave a substantially different account. He testified that the issue first arose "within the first third of the case," well before closing arguments and before deliberations began. 2-ER-318. He further testified that he initially learned of the text not from Juror No. 1, but from another juror, who announced that "Juror Number 1 got a message," prompting what he described as "a larger discussion" among multiple jurors. 2-ER-319. Although Juror No. 3 personally believed the message was "just pure coincidence," he testified that the similarity between the sender's name, the Colorado telephone number, and evidence introduced at trial "caused some alarm." 2-ER-218. He further explained that the jurors had "different feelings about it," described an atmosphere of "awareness" and "maybe some caution, particularly from Juror 1," and testified that there were "no attempts to underestimate what it could be." 2-ER-323. According to Juror No. 3, because the jurors spent eight hours each day together, the text message became "something to talk about," with jurors each reaching "their own decision about the validity of it." 2-ER-327.

Juror No. 4 testified that he first learned about the text message only after the verdict had been returned. He recalled other jurors explaining that Juror No. 1 remained behind because she had received a "weird text message" from a Colorado telephone number and wanted to speak with the judge or court personnel. Significantly, Juror No. 4 remembered other jurors describing Juror No. 1 as being "freaked out" by the communication. 2-ER-335.

Juror No. 7 likewise testified that Juror No. 1 discussed the messages before the verdict. She recalled that the conversation occurred during a break after closing arguments while several jurors were gathered in the jury room. 2-ER-336. Juror No. 1 personally showed her the messages and asked whether she believed they were "something to be concerned about." *Id*. Although Juror No. 7 responded that she did not believe the communication was connected to the case, she testified that several jurors advised Juror No. 1 that, if she believed the communication might be related to the trial, she should report it to court personnel. *Id*.

Juror No. 9 testified that he never heard anything about the messages, either before or after the verdict.

Juror No. 12 testified that he first learned about the messages after deliberations had concluded, while jurors were gathering their belongings following discharge. Juror No. 1 showed him the messages and asked, "Is this anything?" which he understood to mean whether the communication was

"somehow concerning." 2-ER-348. He recalled that Juror No. 1 intended to notify the bailiff before leaving the courthouse. *Id*.

The jury returned guilty verdicts on all counts on March 19, 2025. Immediately after the jury was discharged, Juror No. 1 informed the court's bailiff that she had received the text messages during trial.

### C. Post-Verdict Procedural History

Following the verdict, Mr. Patron moved for a new trial pursuant to Federal Rule of Criminal Procedure 33, arguing that the unsolicited communications constituted an improper outside contact with a deliberating juror. He argued that Juror No. 1 violated the district court's instructions by: failing to promptly report the communications; responding to the sender; deleting and later recovering the messages; conducting independent internet research concerning the sender's telephone number; discussing the communications with fellow jurors; and allowing the issue to remain unresolved throughout trial and deliberations. Relying on *Remmer v. United States*, 347 U.S. 227 (1954), *United States v. Henley*, 238 F.3d 1111 (9th Cir. 2001), *United States v. Dutkel*, 192 F.3d 893 (9th Cir. 1999), and *United States v. Angulo*, 4 F.3d 843 (9th Cir. 1993), Mr. Patron argued that the outside communication was presumptively prejudicial and required a new trial unless the government rebutted that presumption.

The government opposed the motion, characterizing the communications as unsolicited spam messages that Juror No. 1 immediately recognized as unrelated to the case. It argued that the communications neither constituted jury tampering nor created a credible risk of influencing the verdict because every juror who learned of the messages believed they were merely spam and that the communications did not affect jurors' ability to remain fair and impartial. The government further argued that the district court should apply the two-step framework articulated in *Godoy v. Spearman*, 861 F.3d 956 (9th Cir. 2017), and deny the motion because the communications did not create a sufficient risk of prejudice.

The district court conducted evidentiary hearings on May 16, May 19, and May 21, 2025. During those hearings, the court individually questioned each deliberating juror regarding the text messages, the timing and substance of any discussions among jurors, the jurors' perceptions of the communications, and whether the communications affected their ability to remain fair and impartial. The testimony revealed significant inconsistencies regarding when the messages were first discussed, how many jurors learned of them before the verdict, and the extent to which Juror No. 1 expressed concern regarding the communications.

Following the evidentiary hearings, the district court denied Mr. Patron's motion for a new trial.

### D. The District Court Erred In Concluding the Government Successfully Rebutted the Remmer Presumption of Prejudice

The Sixth Amendment guarantees every criminal defendant the right to trial before an impartial jury. "Private communications, possibly prejudicial, between jurors and third persons" threaten that guarantee because they introduce outside influences into the deliberative process. *Remmer v. United States*, 347 U.S. 227, 229 (1954). Accordingly, when a deliberating juror receives an unauthorized outside communication concerning a pending criminal case, prejudice is presumed, and the burden shifts to the government to establish that the communication was harmless. *Id*.; *Godoy v. Spearman*, 861 F.3d 956, 967-69 (9th Cir. 2017) (en banc); *United States v. Henley*, 238 F.3d 1111, 1115-18 (9th Cir. 2001).

This Court recently reaffirmed that framework in *United States v. Sanchez*, No. 23-2533 (9th Cir. May 12, 2026), explaining that once a defendant establishes a sufficiently improper outside influence, there arises a "strong presumption of prejudice," and the government bears a "heavy burden" to prove harmlessness.

The district court correctly recognized that *Remmer* governed this case and therefore conducted a three-day evidentiary hearing. But after developing the factual record, it effectively abandoned the *Remmer* framework. Rather than requiring the government to rebut the presumption of prejudice with objective evidence demonstrating that the communication could not have affected the jury's

deliberations, the court concluded that the government had carried its burden because the jurors testified they believed the communication did not influence their verdicts. That is not the inquiry *Remmer* requires.

1. The outside communication created a credible risk of influencing the jury.

The district court characterized the communication as little more than an unsolicited spam message. That characterization misses the relevant inquiry. The question under *Remmer* is not whether the communication ultimately proved to be innocuous. The question is whether, at the time it occurred, it created a credible risk of influencing the jury's deliberations. Here, the record demonstrates that it did.

Juror No. 1 did not simply disregard the communication. Instead, she responded to the unknown sender, deleted the messages, later recovered them, independently researched the sender's Colorado telephone number on Google, and compared the results of that research with her trial notes after noticing similarities between the sender's name and Colorado area code and evidence introduced during trial. Believing there was a possibility that the communication was connected to the case, she showed the messages to fellow jurors and sought their opinions regarding whether the communication was "something to be concerned about." 2-ER-315. Yet, despite those concerns, she continued deliberating without notifying the court.

Even after the jury returned its verdict, Juror No. 1 remained sufficiently troubled that she sought out the court's bailiff because, absent reassurance from someone who "works in the system," the issue "would keep being in my mind."

Juror No. 1 candidly acknowledged that the communication caused her mind to go to "negative places." *Id*. She testified that she remained "wary," wanted to protect her own safety, and "didn't want to take a chance." 2-ER-307. Those concerns persisted throughout trial and deliberations and were not resolved until after the verdict had been returned.

This sequence of events—not the government's after-the-fact characterization of the messages as spam—is what matters under *Remmer*. At the time deliberations were occurring, Juror No. 1 believed there was a realistic possibility that someone connected to the case had contacted her. Acting on that belief, she independently investigated the communication, compared outside information with the evidence admitted at trial, discussed the matter with fellow jurors, and continued deliberating while her concerns remained unresolved.

Those objective facts establish far more than the "credible risk of influencing the verdict" under *Remmer*.

2. The outside communication became part of the jury's deliberative environment.

The evidentiary hearing further established that the communication did not remain confined to Juror No. 1.

Juror No. 3 testified that the issue arose "within the first third of the case," before deliberations, after another juror announced that Juror No. 1 had received a message. 2-ER-317. According to Juror No. 3, this prompted "a larger discussion" among multiple jurors. 2-ER-319. Although he personally believed the communication was probably coincidental, he testified that the similarities between the sender's name, the Colorado telephone number, and evidence introduced at trial "caused some alarm." 2-ER-318. He explained that jurors had "different feelings" about the communication, that there existed "a little bit of awareness and maybe some caution, particularly from Juror 1," that there were "no attempts to underestimate what it could be," and that, because the jurors spent eight hours together each day, the communication became "something to talk about." 2-ER-327.

Juror No. 7 similarly testified that Juror No. 1 personally showed her the messages before the verdict and asked whether they were "something to be concerned about." 2-ER-337. Other jurors advised Juror No. 1 that, if she believed the communication might be connected to the case, she should notify the Court.

Juror No. 4 likewise recalled that other jurors described Juror No. 1 as being "freaked out" by the communication. 2-ER-335.

This testimony directly undermines the district court's implicit conclusion that the communication remained isolated to Juror No. 1. Instead, it demonstrates that the communication infected the jury room, became the subject of discussion among multiple jurors, and formed part of the deliberative environment.

3. The district court replaced *Remmer's* objective inquiry with a subjective one.

Although the district court conducted an evidentiary hearing, it ultimately denied relief because each juror testified that he or she believed the communication did not affect the verdict. In doing so, the court substituted a subjective inquiry for the objective analysis required by *Remmer*.

The purpose of *Remmer*'s presumption is to recognize that jurors are often incapable of accurately assessing the subtle effect an outside influence may have on their own deliberations. For that reason, once an unauthorized communication creates a credible risk of influencing the jury, the government bears a heavy burden to establish harmlessness through objective evidence. It cannot satisfy that burden merely by eliciting jurors' retrospective assurances that they believed they remained impartial.

Here, the objective evidence overwhelmingly demonstrated that the communication affected Juror No. 1's conduct throughout trial. She believed the message might be connected to the case. She independently investigated it. She compared outside information with evidence admitted at trial. She involved fellow

jurors in evaluating the communication. She continued deliberating while concerned for her safety. And, immediately after the verdict, she sought reassurance from the court's bailiff because the incident continued to trouble her.

Those objective facts cannot be overcome simply because Juror No. 1 later testified that she believed the communication did not influence her verdict. Nor can they be overcome by similar assurances from the remaining jurors. If retrospective assurances of impartiality were sufficient to rebut Remmer's presumption, the presumption itself would cease to have any practical force.

Nor did the government present objective evidence dispelling the possibility of prejudice. It offered no evidence demonstrating that the communication could not have affected deliberations. Instead, it relied almost exclusively upon jurors' own assessments of their impartiality. As *Sanchez* recently reaffirmed, however, once *Remmer's* presumption applies, the government bears a "heavy burden" to establish harmlessness. That burden was not satisfied here.

4. Even accepting the district court's factual findings, the government failed to rebut *Remmer's* presumption.

The government is expected to argue, as it did below, that the district court's credibility findings are entitled to substantial deference. That proposition, while unremarkable, is beside the point. Mr. Patron does not ask this Court to reject the district court's credibility determinations. Rather, he argues that, even accepting

those findings, the district court applied the wrong legal standard in concluding that the government rebutted *Remmer*'s presumption of prejudice.

Nothing in this appeal turns on whether Juror No. 1 ultimately believed the text messages were spam. Nor does it turn on whether the court credited one juror's recollection over another's regarding precisely when the communication was discussed or how many jurors participated in those discussions. Those factual disputes are immaterial to the legal question presented.

The facts that the district court accepted are themselves sufficient to establish a credible risk of prejudice. The court found that Juror No. 1 received an unauthorized communication during trial from an unknown sender. It found that she responded to the sender, deleted and later recovered the messages, independently researched the sender's Colorado telephone number, compared the results of that research with her trial notes, showed the messages to other jurors, and delayed reporting the incident until after the verdict. It further found that Juror No. 1 remained sufficiently concerned to seek out the bailiff immediately after trial because she wanted reassurance from someone "who works in the system" regarding whether the communication posed any danger.

Those findings establish exactly what *Remmer* contemplates: a deliberating juror who believed an unexplained outside communication might be connected to the case and whose concern persisted throughout deliberations. Once those facts

were established, the burden shifted to the government to prove that the communication could not have affected the jury's deliberations.

The government never made that showing. It did not explain why Juror No. 1's concern was objectively unreasonable. It did not rebut the significance of her independent investigation or her discussions with fellow jurors. Instead, it asked the district court to conclude that the communication was harmless because Juror No. 1—and the remaining jurors—ultimately testified that they believed they remained impartial.

Indeed, accepting the district court's factual findings only highlights the legal error. Those findings establish that Juror No. 1's conduct changed because of the outside communication. She undertook investigative steps she otherwise would not have taken, consulted fellow jurors about a matter outside the evidence, and continued deliberating while uncertain whether she had been contacted by someone connected to the case. Those objective facts are undisputed.

The district court nevertheless concluded that the government had rebutted *Remmer*'s presumption because Juror No. 1 ultimately testified that the communication did not affect her verdict. In doing so, the court replaced *Remmer*'s objective inquiry with a subjective one. If jurors' retrospective assurances of impartiality were sufficient to rebut the presumption, *Remmer*'s presumption would have little practical force.

Because the government failed to carry the heavy burden imposed by *Remmer*, the district court abused its discretion in denying Mr. Patron's Rule 33 motion. Mr. Patron's convictions should therefore be vacated, and the case remanded for a new trial.

## III. THE GOVERNMENT VIOLATED MR. PATRON'S DUE PROCESS AND COMPULSORY-PROCESS RIGHTS BY DEPORTING MATERIAL WITNESS A.V. AND THEN REFUSING TO PURSUE CONCRETE LEADS TO HIS WHEREABOUTS

### A. Standard of Review

In cases of constitutionally guaranteed access to evidence, wherein the Government loses potentially exculpatory evidence, the Supreme Court applies a two-pronged test of bad faith and prejudice. In *United States v. Valenzuela-Bernal*, 458 U.S. 858, 866-67, 102 S. Ct. 3440, 3445-46, 73 L. Ed. 2d 1193 (1982). Under this two-pronged test, the defendant must make an initial showing that the Government acted in bad faith and that this conduct resulted in prejudice to the defendant's case. To prevail under the prejudice prong, the defendant must at least make "a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *Valenzuela*, 458 U.S. at 873, 102 S. Ct. at 3449.

### B. A.V. Was a Material Eyewitness Whose Testimony Was Plausibly Favorable to the Defense

The Fifth and Sixth Amendments are not violated merely because the government deports a potential witness. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872-73 (1982). A constitutional violation arises, however, when the government acts in bad faith and the defendant is prejudiced by the loss of testimony that was material and favorable to the defense. *Dring*, 930 F.2d at 693-94. To establish prejudice, the defendant need only make a plausible showing that the deported witness could have provided material, favorable testimony that was not merely cumulative. *United States v. Medina-Villa*, 567 F.3d 507, 517 (9th Cir. 2009). Because a defendant ordinarily cannot know precisely what an unavailable witness would have said, materiality may be shown from the events the witness observed and the relevance of those events to the charged offenses. *Id.; Valenzuela-Berna*l, 458 U.S. at 871.

According to the government's own investigation, A.V. participated in transporting Rendon, remained with him during portions of his captivity, helped move him between locations in Tijuana, and admitted holding him overnight at a hotel before the murder. Those facts placed A.V. among the small group of witnesses with firsthand knowledge of the events immediately preceding the homicide.

By the time agents interviewed A.V., investigators had already identified Mr. Patron as the person they believed shot Rendon. Yet A.V. did not identify Mr. Patron as participating in the events he witnessed. A.V. could have testified about who transported Rendon, who guarded him, who moved him between locations, who was present during the captivity, what was said about the purpose of holding him, and what role, if any, Mr. Patron played before the shooting. Those subjects went directly to identity, participation, intent, the existence and scope of any conspiracy, and whether Mr. Patron was engaged in a federally punishable narcotics offense at the time of the homicide.

The government's own treatment of A.V. confirms his materiality. FBI Special Agent Paisley testified that investigators initially intended to indict him and interviewed him after identifying Mr. Patron as the suspected shooter because they hoped A.V. would provide information helpful to the prosecution. Instead, A.V. denied or minimized his own involvement, refused to provide information investigators believed to be true, and did not advance the government's theory. Agent Paisley ultimately described him as not "help[ful]." 3-ER-593. A witness whom the government believed was sufficiently involved to be indicted, and whom agents repeatedly interviewed because of his direct knowledge of the charged events, did not become immaterial merely because his account failed to assist the prosecution.

### C. The Record Supports a Finding That the Government Acted in Bad Faith

Bad faith may be established when the government departs from normal procedures or deports a witness to obtain an unfair tactical advantage at trial. *United States v. Gastelum-Almeida*, 298 F.3d 1167, 1174 (9th Cir. 2002). Although the Executive has a legitimate interest in promptly deporting removable witnesses, that interest does not permit removal without regard to an accused's right to a fair trial. Deportation is constitutionally permissible only after a good-faith determination that the witness possesses no evidence favorable to the defense. *Hilliard v. Spalding*, 719 F.2d 1443, 1446-47 (9th Cir. 1983).

The record permits a finding of bad faith because the government did not deport an unknown or peripheral witness following routine immigration screening. Rather, it affirmatively brought A.V. into the United States, arrested him on a material-witness warrant, and subjected him to an interview because it knew he had participated in the charged events and possessed firsthand knowledge of Mr. Patron's believed participation.

Shortly after their interview of A.V., agents interviewed Dorantes Rivera, one of the individuals who had participated in the forcible kidnapping of Rendon from a hotel in Tijuana and who was then in federal custody on an unrelated drug offense. During the interview, agents told Dorantes that they already "knew what

happened" and "who was involved," but needed his help to "verify" what they already knew. They explained that what they needed was a "good" witness. 4-ER-891-93. Agents then laid out their theory of Mr. Patron's involvement and repeatedly encouraged Dorantes to "verify" their account. *Id*.

After serving as the government's "good witness," Dorantes ultimately received a five-year sentence for his role in Rendon's kidnapping—an offense that otherwise exposed him to a mandatory sentence of life imprisonment. 1-ER-227; 4-ER-914.

This evidence supports the reasonable inference that investigators were not simply gathering facts; they were seeking witnesses who would corroborate a preexisting theory of the case. That inference is reinforced by Special Agent Paisley's trial testimony that the government delayed indicting Mr. Patron until it had secured three "corroborating witnesses," waiting "well over a year" after investigators had settled on their theory that Mr. Patron killed Rendon.[2] 3-ER-616. Viewed together, this evidence permits the inference that, rather than testing competing explanations, the government intentionally delayed Mr. Patron's indictment until it had assembled witnesses whose testimony corroborated the theory investigators had already embraced, while deporting witnesses who did not.

---

[2] The government did not wait for three corroborating witnesses to indict Alan, Wyatt or Jonathan.

Consistent with that approach, agents interviewed A.V. after concluding that Mr. Patron was the suspected shooter. Yet when A.V. denied or minimized his own involvement and failed to provide information investigators considered "help[ful," the government abandoned its plan to indict him, released him from federal custody, and deported him to Mexico without preserving his testimony. The government neither retained A.V. as a material witness nor sought to perpetuate his testimony by deposition before removing him from the country.

The timing of those decisions further supports an inference of bad faith. The government deported A.V. before indicting Mr. Patron, even though the investigation had already identified Mr. Patron as the suspected shooter, and by Special Agent Paisley's own admission at trial, plainly contemplated his prosecution. Viewing the record as a whole, a reasonable factfinder could infer that the government delayed seeking Mr. Patron's indictment until after it had determined which witnesses would advance its theory of the case, thereby ensuring that an unhelpful eyewitness was removed from the United States before the defense had any opportunity to obtain his testimony. At a minimum, these circumstances warranted an evidentiary hearing to determine whether the government deliberately structured the timing of A.V.'s deportation and Mr. Patron's indictment to obtain a tactical advantage at trial.

The government may not circumvent a defendant’s constitutional rights by controlling the availability of eyewitnesses through the timing of its charging decisions. If the government believed A.V. possessed exculpatory or inconsistent information, it could not simply deport him before bringing charges against Mr. Patron and thereby insulate its decision from meaningful adversarial testing. The district court's refusal to permit discovery or conduct an evidentiary hearing prevented Mr. Patron from developing precisely that claim

### D. The Government’s Refusal to Pursue Concrete Leads to A.V.’s Whereabouts Compounded the Violation

The prejudice did not end with A.V.’s deportation. The paperwork effectuating his release from federal custody identified only one family member: his brother Wyatt, who signed A.V.’s material-witness stipulation. Wyatt was therefore the only person identified in the release records as participating in A.V.’s departure from custody and an obvious potential source of information concerning his whereabouts.

During pretrial proceedings, the government disclosed that another FBI agent assigned to aspects of Mr. Patron’s case had entered into a romantic relationship with Wyatt and A.V.’s other brother, who was himself a law-enforcement officer. The agent had transported Mr. Patron from the FBI building to MCC and had accessed confidential documents relating specifically to him.

Through that relationship, a member of the prosecution team had a personal connection to the one identified family member reasonably likely to know how to contact A.V.

Mr. Patron sought narrowly tailored relief. He requested discovery concerning A.V.'s immigration records and location, an evidentiary hearing, and an order requiring the government to determine whether the FBI agent, Wyatt, or other members of the prosecution team, possessed information that could lead to A.V. He also requested appropriate remedial relief, including dismissal, recusal, or a jury instruction, if the government could not cure the prejudice caused by the deportation. 3-ER-738. These requests did not depend on speculation. They identified a concrete lead arising from the prosecution team's own intimate relationship with A.V.'s family.

The court denied each request. *Id*. It declined to hold an evidentiary hearing, refused to require any inquiry into whether A.V.'s brother could provide A.V.'s whereabouts, denied discovery concerning A.V.'s location, declined to provide a missing witness jury instruction, and prohibited the defense from presenting evidence about the FBI agent's romantic relationship with A.V.'s brother. *Id*. The defense was therefore left without access to A.V., without discovery concerning his whereabouts, and without any ability to inquire into whether the prosecution team possessed information capable of restoring access to him.

Once the defense identified a concrete avenue for locating the deported material witness, the government's resistance to any inquiry compounded the original constitutional injury. It prevented the defense from determining whether A.V. could still be found and from obtaining the firsthand testimony that the government had failed to preserve. That later conduct also strengthened the inference that A.V.'s absence was not harmless and that the defense was being denied meaningful access to potentially favorable evidence.

### E. The District Court's Refusal to Order Discovery, Conduct an Evidentiary Hearing, or Provide Any Remedy Requires Reversal

The combined effect of the government's conduct deprived Mr. Patron of a fair opportunity to present a defense. The government deported one of the few surviving eyewitnesses to the charged events after he failed to corroborate its theory, without preserving his testimony. When the defense later identified a concrete means by which the government could attempt to locate him, the prosecution resisted any inquiry and the district court refused to require one. 1-ER-103.

The resulting prejudice was substantial. A.V. possessed firsthand knowledge of the victim's captivity and of the identities and roles of those involved. His testimony bore directly on the government's theory that Mr. Patron participated in

the charged conduct and was engaged in a qualifying federal drug conspiracy at the time of the homicide. No other witness could fully replace testimony from a participant whom the government, at one point, intended to indict.

At a minimum, the court abused its discretion by refusing to conduct an evidentiary hearing or to require the government to investigate the concrete lead identified by the defense. Absent that inquiry, neither the district court, nor this Court, can determine whether A.V. remained locatable, what information the prosecution team possessed, or the full extent of the prejudice caused by his deportation. Mr. Patron's convictions should therefore be reversed and the case remanded for a new trial or, at minimum, for an evidentiary hearing.

## IV. COUNT ONE MUST BE VACATED BECAUSE THE GENERAL VERDICT DOES NOT ESTABLISH THAT THE JURY UNANIMOUSLY FOUND THE SAME PREDICATE DRUG OFFENSE

Count One charged Mr. Patron with intentional killing while engaged in drug trafficking, in violation of 21 U.S.C. § 848(e)(1)(A). The district court instructed the jury that it could convict if the government proved that Mr. Patron acted while engaged in either: (1) a conspiracy to possess methamphetamine with intent to distribute, punishable under § 841(b)(1)(A); or (2) a conspiracy to import methamphetamine, punishable under § 960(b)(1). The instructions separately defined those alternatives, and their distinct agreements, but the court did not give

a specific unanimity instruction that required all twelve jurors to agree on the same predicate offense.

### A. Standard Of Review

Whether jury instructions correctly state the elements of an offense and adequately protect the constitutional requirement of unanimity is reviewed de novo. *See United States v. Montalvo*, 331 F.3d 1052, 1057–58 (9th Cir. 2003).

### B. The § 841 and § 960 Predicates Were Distinct Elements, Not Interchangeable Factual Means.

Section 848(e)(1)(A) creates a substantive federal homicide offense, not merely a sentencing enhancement to an underlying drug conviction. To convict, the government therefore had to prove, beyond a reasonable doubt that, at the time of the killing, Mr. Patron was engaged in one of the qualifying predicate drug offenses identified in the statute and charged in Count One. The predicate was not background conduct; it was the element that supplied the federal drug nexus and exposed Mr. Patron to § 848(e)(1)(A)'s twenty-year mandatory minimum and potential death sentence. *See Apprendi v. New Jersey*, 530 U.S. 466, 476–77 (2000).

The two predicates submitted here were legally and factually different. The § 841 theory required an agreement to possess methamphetamine with intent to distribute it. The § 960 theory, on the other hand, required an agreement to import

methamphetamine into the United States. One can exist without the other. A juror could have concluded that Mr. Patron participated in an agreement to recover drugs or money but did not participate in the botched importation plan; another could have concluded that he joined the importation conspiracy while rejecting that he participated in the domestic distribution plan. Those conclusions would represent findings of different federal offenses with different elements, objects, and geographic components.

Our Supreme Court, in *Richardson v. United States*, 526 U.S. 813 (1999), confirmed the governing unanimity principle. *Richardson* held that jurors, in a continuing-criminal-enterprise prosecution, had to agree unanimously on the specific drug violations that composed the statutory "series." *Id*. at 815, 824. Mr. Patron does not contend that *Richardson* directly controls this prosecution under § 848(e)(1)(A). Its reasoning is nevertheless instructive: when Congress makes underlying federal drug violations operative components of an aggravated offense, jurors may not divide over materially different violations and still return a single guilty verdict. That principle applies here because § 848(e)(1)(A) required engagement in "an offense" punishable under one of the enumerated statutes, not merely some generalized form of drug trafficking.

### C. The Instructions and General Verdict Permitted a Nonunanimous Predicate Finding.

The court instructed the jury in the disjunctive: it could convict on Count One if it found either the § 841-based conspiracy or the § 960-based conspiracy. The verdict form asked only whether Mr. Patron was guilty or not guilty of Count One. It did not require the jury to identify the predicate offense, and no instruction told the jurors that they must unanimously agree on the same one. The resulting verdict, therefore, establishes only that each juror found some qualifying predicate; it does not establish that all twelve found the same predicate.

The defense sharply distinguished the original importation plan from the later effort to recover the stolen methamphetamine or its value. The original importation agreement, according to the government's witnesses, involved Rendon, Wyatt Valencia-Pacheco, Parce, and Lomeli and contemplated that Rendon would carry the methamphetamine into the United States. 3-ER-801. The defense argued that this conspiracy failed when Rendon absconded with the drugs--*before* Mr. Patron allegedly became involved. Any later agreement, the defense maintained, concerned recovery of the drugs, money, or value in Mexico so that Parce could be repaid—not importation into, or distribution within, the United States. 3-ER-704.

That theory attacked the two predicates on different grounds. As to § 960, the defense argued that Mr. Patron did not participate in the original importation conspiracy. As to § 841, the defense argued that the later recovery effort did not

establish an agreement to distribute methamphetamine in the United States. The Rule 29 motion likewise separately challenged proof of importation and proof of any domestic distribution objective. The government, meanwhile, relied on the planned border crossing to support importation and on the later recovery efforts to connect Mr. Patron to drug trafficking. Because both theories were live, disputed, and analytically distinct, some jurors could have relied only on § 841 while others relied only on § 960.

D. **The Error Requires Reversal of Count One**.

The omission was prejudicial because the predicate offense was the central disputed issue linking the homicide in Mexico to § 848(e)(1)(A). This was not a case in which the alternative predicates rested on identical proof or in which the evidence overwhelmingly established both. The defense contended that the importation agreement had ended before Mr. Patron's alleged involvement and that the later recovery effort had no United States distribution objective. On this record, the Court cannot conclude that the jury necessarily agreed on either predicate.

A unanimous federal verdict requires that all twelve jurors find every element of the offense beyond a reasonable doubt. *Richardson*, 526 U.S. at 817; *Montalvo*, 331 F.3d at 1057–58. Because the verdict does not establish that the jury unanimously found the same qualifying predicate drug offense, Mr. Patron's conviction on Count One should be vacated.

## V. THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN COUNT ONE BECAUSE THE GOVERNMENT FAILED TO PROVE THAT MR. PATRON WAS ENGAGED IN A QUALIFYING FEDERAL DRUG OFFENSE AT THE TIME OF THE HOMICIDE

### A. Standard of Review

This Court reviews de novo whether the evidence was sufficient to sustain a conviction. *United States v. Barai*, 55 F.4th 1245, 1251 (9th Cir. 2022). Viewing the evidence in the light most favorable to the government, the Court asks whether any rational trier of fact could have found every essential element of the offense beyond a reasonable doubt. *United States v. Jaimez*, 45 F.4th 1118, 1123 (9th Cir. 2022).

The government was required to prove that, at the time of the homicide, Mr. Patron was "engaging in" a felony punishable under one of the federal drug statutes identified in § 848(e)(1)(A). It failed to do so.

### B. The Original Importation Conspiracy Had Ended Before Mr. Patron's Alleged Involvement

The government's own witnesses established that the conspiracy to import methamphetamine into the United States was formed before Mr. Patron entered the picture and, more importantly, had already failed before he allegedly became involved.

Alan Lomeli testified that the original conspiracy consisted of Rendon, Wyatt Valencia-Pacheco, Parce, and Lomeli. Their agreement was that Rendon

would smuggle approximately two pounds of methamphetamine into the United States, where the load would be delivered and the participants would be paid.

Every material step in furtherance of that importation plan occurred before Mr. Patron's alleged involvement. He did not recruit Rendon, obtain the courier, strap the methamphetamine to Rendon's body, accompany the participants to Parce's residence, travel with them to the border, participate in the planned crossing, or expect compensation from a successful importation.

According to Lomeli, the plan failed when Rendon absconded with the methamphetamine. Once Rendon stole the load, the specific objective of the agreement—to import that methamphetamine into the United States—could no longer be accomplished. The courier had abandoned the crossing, taken possession of the drugs for himself, and disposed of at least some portion of them.

The government therefore failed to prove that Mr. Patron joined the original importation conspiracy while it remained ongoing. A person may join an existing conspiracy after its formation, but he cannot retroactively join a completed or abandoned agreement whose object has already failed. The evidence established no agreement by Mr. Patron to revive the original border-crossing plan or to import the recovered drugs into the United States.

### C. Any Later Agreement Was A Separate Recovery Effort Without The Required United States Nexus

The evidence established, at most, a later agreement with a materially different objective. Lomeli testified that Rendon, Lomeli, and Wyatt—not Mr. Patron—were responsible to Parce for the missing load. Once Rendon absconded, the participants' objective was no longer to complete the planned importation. They instead sought to recover the stolen methamphetamine, the proceeds from its sale, or its equivalent value so that Parce could be repaid in Mexico. 4-ER-979.

By that point, the participants understood that Rendon had stolen the narcotics and had sold at least part of the load. The later effort therefore focused on locating Rendon and recovering property or money from him. If the methamphetamine itself could be recovered, the evidence indicated that it would be returned to Parce in Mexico. If it could not, the participants sought money representing its value.

The government introduced no evidence that Mr. Patron agreed that any recovered methamphetamine would be transported into the United States, distributed in the United States, or delivered to any person in the United States. Nor did it identify a domestic purchaser, distributor, destination, or contemplated border crossing associated with the later recovery effort.

Thus, even assuming Mr. Patron knowingly joined some later agreement, it was not the importation conspiracy charged in Count One. At most, the evidence

showed participation in a separate effort to recover drugs, money, or property within Mexico after the original importation plan had already collapsed.

That later agreement also did not establish the § 841 predicate. The government was required to prove an agreement to possess methamphetamine with intent to distribute it in the United States. Proof that participants sought to recover stolen drugs or their value for return to Parce in Mexico did not establish an agreement to distribute methamphetamine domestically. The mere possibility that recovered drugs might later be sold somewhere was insufficient to establish the specific federal conspiracy charged.

### D. No Rational Juror Could Find The Required Predicate Beyond A Reasonable Doubt

Section 848(e)(1)(A) required proof that Mr. Patron was engaged in a qualifying federal drug felony when the homicide occurred. Because the evidence did not establish that Mr. Patron was engaged in a felony punishable under § 841(b)(1)(A) or § 960(b)(1) at the time of the homicide, no rational juror could find the essential federal drug predicate beyond a reasonable doubt. Count One must therefore be reversed with instructions to enter a judgment of acquittal.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Date: July 23, 2026

MEGHAN A. BLANCO

*/s/ Meghan Blanco*
Meghan A. Blanco

*Attorney for Brian Alexis Patron Lopez*

## CERTIFICATE OF COMPLIANCE

I certify that:

This brief complies with the word limit of Ninth Circuit Rule 32-1 because this brief contains 13,996 words, including words manually counted in any visual images, and excluding the items exempted by Fed. R. App. P. 32(f).

This brief complies with the type size and typeface requirements of Fed. R. App. P. 32(a)(5) and (6).

Date: July 23, 2026

MEGHAN A. BLANCO

*/s/ Meghan A. Blanco*
MEGHAN A. BLANCO

*Attorney for Appellant Brian Alexis Patron Lopez*

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate Electronic Filing system.

Description of Documents: Appellant's Opening Brief; Excerpts of Record, Volumes 1-8.

Date: July 23, 2026

MEGHAN A. BLANCO

*/s/ Meghan A. Blanco*
MEGHAN A. BLANCO

*Attorney for Appellant Brian Alexis Patron Lopez*